MANUEL MEZA, Plaintiff, *v.* OTTO B. KNAUTH and Another, Copartners Doing Business under the Firm Name and Style of KNAUTH BROTHERS, Defendants.

Supreme Court, New York County, December 12, 1927.

**Master and servant — contracts — action to recover for personal services — evidence justifies verdict in favor of plaintiff.**

This is an action to recover for personal services alleged to have been rendered by the plaintiff under a contract whereby the defendants agreed to pay the plaintiff a commission on business procured by the plaintiff in Mexico. Each year the parties had the books examined and audited and the bad and doubtful accounts of the Mexican department were charged off, either in whole or in part, and the net profits of this department were determined and plaintiff was paid his commission according to the profits thus determined. For the last year which the plaintiff worked under that agreement the same procedure was followed but the plaintiff refused the check on the theory that its retention might prejudice a claim which he had against the defendants under another contract. The defendants contend that in a final statement of the Mexican business for several years there was a deficit caused by bad accounts to the amount of approximately $17,000 and they seek to recover on a counterclaim for excess payments made to plaintiff. The defendants' contentions cannot be sustained and the plaintiff is entitled to recover the commissions he claims for the last year's business but he is not entitled to a percentage of a fund of $500 set up, under an agreement between himself and defendants, as a reserve fund to protect the Mexican business.

The plaintiff also contends that he is entitled to a percentage of a claim collected by the defendants from the Mexican government. It appears that the defendants endeavored to obtain a construction contract from the Mexican government and, according to the plaintiff, sought his aid in introducing the defendants to the proper authorities and otherwise aiding them in securing that contract. The contract, however, was not awarded to the defendants and they presented a claim to the Mexican government of approximately $100,000 to cover their expenses. The evidence shows that the defendants did engage the plaintiff to recover their expenses from the Mexican government and that he took charge thereof and finally succeeded in having the defendants' claim allowed to the extent of $14,400.96, and the evidence also sustains plaintiff's contention that the defendants hired him on the basis of fifteen per cent commission to collect their claim against the Mexican government.

ACTION to recover for personal services. Stipulated for trial by the court without a jury with consent for court to direct a verdict at the close of the case with the same force and effect as if the jury were present.

*Hardin & Hess* [*W. M. Hinkle* of counsel], for the plaintiff.

*Cadwalader, Wickersham & Taft* [*W. S. Taft* of counsel], for the defendants.

23

GOLDSMITH, J. The defendants have been engaged for many years in commercial pursuits under various business arrangements. The plaintiff is a native of Mexico and was sent to this country by the Mexican government as an accountant for the Financial Agency of Mexico, located in New York city. While connected with this agency he became acquainted with the defendants through business transactions. In September, 1920, he severed his relations with the Mexican government and in November of the same year entered the employment of Knauth, Gehring & Raynier, engaged in the general exporting business. The defendants were the principal owners and dominant members of this firm. The employment was the result of a determination of this firm to develop an export trade in certain Latin-American countries and plaintiff was selected to take charge of this branch of the business because of his nationality and his acquaintanceship and associations in Mexico. It was proposed that the firm should be incorporated with the name of Knauth, Gehring & Raynier, Inc., and plaintiff made a director thereof, and this arrangement was almost immediately carried into effect.

There is a dispute as to the compensation which plaintiff was to receive for the first year, defendants asserting that it was fixed at fifty dollars per week, while plaintiff claims that he was to be paid fifty dollars per week, plus ten per cent of the net profits of the Mexican department. The plaintiff received fifty dollars per week during this period, and as there were not any profits it is unnecessary to pursue the inquiry in relation to the alleged percentage arrangement. In the fall of 1921, however, pursuant to a new agreement, the plaintiff's compensation was increased for the ensuing year to seventy-five dollars per week, plus fifteen per cent of the net profits of the Mexican department, to be computed at the end of the fiscal year. At the close of the year 1922 the books of the corporation were examined and audited by an accountant, the bad and doubtful accounts of the Mexican department were discussed and considered by the defendants and plaintiff and charged off either in whole or in part, the usual statements and summaries were drawn and entered, and the net profits of the department were determined. Prior to ascertaining the net profits for the year 1922 the defendants suggested that this department might sustain losses and " that there should be a certain amount put aside to reinforce us against what ultimately would prove ruinous business." The sum of five hundred dollars was thereupon deducted from the gross profits for 1922 and placed in a reserve fund for this purpose and an account was opened to carry this fund. Upon the net profits as thereafter determined for the year 1922 plaintiff's

share of fifteen per cent was computed and credited to his account and subsequently paid over to him.

The plaintiff continued his association with the firm under the same financial arrangements in respect to the export business until February, 1925, when he notified the defendants that he was leaving their employment. In 1923 the defendants, adopting the trade name of " Knauth Brothers " and engaging in business as copartners, had taken over the business and assets of the corporation, but this new arrangement created no change in the manner and method of conducting the business or in prior contractual arrangements. At the end of the years 1923 and 1924 the books of the concern were closed in the same manner as they had been in 1922, and the percentage to which plaintiff was entitled was fixed and credited to his account. This percentage was determined each year after the bad and doubtful accounts had been passed upon by the parties. No deductions were made, however, from the reserve fund, which continued to be carried year after year at $500 without any credits or debits. During this period accounts continued to be charged off in whole or in part, but no losses were liquidated out of the reserve fund. For the year 1923 the plaintiff received the amount credited to him as commissions and for the year 1924 he received a check in the sum of $732.33, representing such commissions, but he returned this check because he feared its retention might prejudice a claim he was making against the defendants arising out of a different transaction. When this check was sent to the plaintiff he had quit his position and the defendants then knew that there were worthless accounts upon the books that had been carried over into the year 1925.

The defendants now assert that they never had a complete settlement with the plaintiff. They contend that the salary account with the plaintiff was open and current and that upon the termination of business relations they were entitled to marshal all bad accounts incurred during plaintiff's association with them and included in the assets employed in reaching the net profits of any year and recover from him as overpayments any percentage that was computed thereon and was paid to him. According to defendants these bad accounts amount to approximately $17,000, and they have entered a counterclaim to recover the alleged excess payments. I cannot concur in their position, which is obviously in contradiction of the intention and the acts of the parties. The proof is that there was not any agreed method for determining net profits, so in the absence of any definite arrangement in this respect the intention of the parties must be gathered from the course pursued by them over the period of their business association. The con-

troversy settles entirely about the disposition of the bad and doubtful accounts in arriving at the net profits, there being no dispute over other items involved in the determination of the net profits. It appears from the evidence that each year the books were audited, the bad and doubtful accounts were considered and an agreed amount thereof charged against the profits of the year, the books were balanced and the net profits were determined. Upon such net profits each year fifteen per cent was credited to the plaintiff, and for the years 1922 and 1923 the sums so credited were paid to the plaintiff, and for the year 1924 the defendants stood ready to pay such sum to the plaintiff. When the books were closed for the year 1924 there was, according to the defendants, some $17,000 in bad debts upon the books, yet no application of the reserve fund was made toward the liquidation of these alleged worthless accounts, nor were they charged off against the gross profits of the Mexican department. The defendants say that the bad and doubtful accounts were carried over upon plaintiff's request in order not to curtail his income. The plaintiff denies the truth of this testimony. It is strange that the defendants would permit plaintiff to substantially overdraw his account each year in a business which they feared might prove unprofitable and where they had protected themselves against loss by establishing a reserve fund of $500. It is also unusual that, after the plaintiff had resigned from his position and the defendants knew that there were uncollectible accounts in the Mexican department, they should send him a check in settlement of his commissions based upon the books as they stood at the close of the year 1924. The arrangement in relation to the bad accounts, as alleged by the defendants, is not in accord with the practice of the parties. It is clear that the intention and purpose of the parties was to settle and conclude their obligations each year upon the books as they stood at the close of the year's business. Such an agreement is the reasonable inference from their acts. The plaintiff is entitled, therefore, to recover the sum of $732.33, the amount appearing upon the books as his percentage of the net profits for the year 1924.

In respect to the reserve fund of $500, I do not believe that plaintiff is entitled to any part thereof. He consented that the sum of $500 be withdrawn from the profits of the year 1922 to establish a fund to protect the defendants against losses. This sum never became or constituted a part of the net profits of the year 1922. It was deducted before the net profits were determined and it became and has remained the absolute property of the defendants. It was set up by them for recoupment against losses and for their own protection, but there was no arrangement or suggestion that

they should account for the same or become liable for any part thereof to the plaintiff.

In February, 1921, in pursuance of his employment to develop the export business of the Mexican department, the plaintiff, accompanied by his wife, sailed for Mexico, reaching Vera Cruz in March. He carried with him a sample trunk and visited the principal cities of Mexico, including Tobasco and Frontera, soliciting business. Upon his return to Vera Cruz in late April his wife was taken ill and he remained temporarily in that city pending her recovery. While so sojourning there, one of the defendants, E. Frederick Knauth, arrived in Vera Cruz. He had come to Mexico upon the request of Dr. Cateregli, who had been in charge of the Financial Agency of Mexico in New York city at the time when the plaintiff was employed there. Dr. Cateregli, like the plaintiff, was acquainted with the defendants through their business dealings with the Financial Agency. The purpose of Mr. Knauth's visit was to enter into competitive bidding for a contract covering a vast dredging and engineering project at the port of Frontera. The original estimate of the cost of the undertaking was $6,000,000, although subsequently the proposed improvements were substantially curtailed in order to bring the cost within $1,000,000. The defendants were extremely desirous of securing the contract for a work of this magnitude and Mr. Knauth had brought with him several engineers to advise and assist in the preparation of the bid for his firm. Mr. Knauth and his party did not speak Spanish and were unacquainted in Mexico with the exception of Mr. Knauth's acquaintanceship with Dr. Cateregli, who was then in Mexico. Mr. Knauth also carried some letters of introduction to official Mexicans which he expected would prove of value. When Mr. Knauth met the plaintiff in Vera Cruz he sought the name of the hotel where plaintiff was stopping and soon called upon plaintiff and explained his mission in Mexico. Learning that plaintiff had completed his sales trip for the export department and was only awaiting the recovery of Mrs. Meza to return to New York, he requested plaintiff to accompany him and his party through Mexico in connection with the Frontera project. It is not disputed that the plaintiff did join Mr. Knauth and his party early in May, 1921, and remained with them until the end of June of the same year, a period of nearly two months.

The parties differ as to the material facts of this business transaction. The plaintiff claims that he was asked to make the trip because of his familiarity with the language and the country and his many friendships with persons of importance in official Mexican circles. Mr. Knauth believed that plaintiff could render valuable

assistance in securing the Frontera contract, and, as an inducement to the plaintiff to abandon for the time the export business and devote his attention to the Frontera project, he offered to give the plaintiff for this work fifteen per cent of any profits that might accrue if the contract should be obtained. In corroboration plaintiff offered testimony to show the extent and importance of his acquaintanceship in Mexico, including a close friendship with the Governor of Tobasco. Mr. Knauth had a letter of introduction to the Governor from Dr. Cateregli, but plaintiff gave him a personal introduction to this executive. Later the Governor and the Treasurer of Tobasco accompanied the Knauth party back to Vera Cruz by boat, and during the trip on many occasions Mr. Knauth urged plaintiff to use his friendship with the Governor to persuade him to speak well of Mr. Knauth to General Obregon, the President of Mexico, whom the Governor was soon to visit in reference to the Frontera contract. There was also testimony that plaintiff was constantly employed by Mr. Knauth as interpreter and on many occasions as his spokesman. The final bid submitted by the defendants was approved and recommended by General Obregon, and it was generally understood and believed that the defendants had received the contract, but the award was ultimately made to another firm. The story of these negotiations, however, is essential to the determination of the case because the character of the services of the plaintiff in Mexico and the relations of the parties have a direct bearing upon a subsequent agreement alleged by the plaintiff to have been made with the defendants and upon which recovery is sought in this action.

Before inquiring into this agreement the defendants' version of the Mexican episode must be discussed. The defendants claim that when Mr. Knauth met the plaintiff in Mexico it was an off season in the export business and that he asked plaintiff to accompany him solely to act as an interpreter, should such services be required, and without any promise or expectation of paying him anything further than the salary of fifty dollars per week which he was receiving and his expenses; that the plaintiff only acted as interpreter on a few occasions, as other persons were available for this work; that the plaintiff rendered no assistance whatever to the defendants through any friendships that he claimed to have in Mexico, and that the presence of the plaintiff in Mr. Knauth's party was actually a handicap because plaintiff's subordinate position was considered no more than a clerkship in Mexico, and, according to the social customs prevailing there, his presence at dinner or at any social gathering was resented and protested.

I am unable to give credence to the defendants' story. It seems

highly improbable that a man who had been engaged for the expressed purpose of building up a new business and whose future in the business depended upon its success would abandon the business for a period of nearly two months to engage in an entirely different enterprise without the expectation of any added remuneration. And it cannot be said with much hope of belief that the plaintiff was merely a clerk and acting entirely in such capacity. Keen business men of the intelligence and experience of the defendants do not place a clerk, using the popular meaning of this word, at the head of a department in which a large investment has been made and confer upon him extensive powers of supervision. This man of education, of business ability, a personal friend of the Governor of Tobasco, engaged by the defendants to develop their export trade through a new business venture, cannot be honestly classified as a clerk, as the name is usually understood. From the evidence presented I feel that the plaintiff's story rings truer and is well fortified by the proof. As has been stated, the services rendered by the plaintiff in attempting to secure the Frontera contract are not the basis of any claim in this action. The facts have been considered because they are preliminary to a proper understanding, conception and determination of plaintiff's subsequent relation with the defendants arising out of the Frontera project.

After the plaintiff returned to New York Mr. Knauth remained for several months in Mexico, submitting at least four, if not five, different bids. Great expense was incurred by the defendants and they were told by representatives of the Mexican government that they would be reimbursed for these expenditures although no agreement had been made to repay them. A bill covering the expenses, totaling near 200,000 pesos, approximately $100,000 in United States exchange, was presented by Mr. Knauth to the Mexican government and was rejected. Mr. Knauth returned to New York in December, 1921. He was disturbed over the action of the Mexican government in respect to the expense account. It was about this time that the defendants and the plaintiff made the new arrangements to increase plaintiff's compensation in the export department for the year 1922 to $75 per week and fifteen per cent of the net profits. The plaintiff claims that at the same time this agreement was made the defendants requested him, because of his familiarity with the Frontera project and with the fiscal affairs of the Mexican government, to assist in collecting their expense account from the Mexican government and for these services the defendants agreed to pay him fifteen per cent of any sum collected. The plaintiff testified that he continuously consulted

with the defendants in relation to this account, advised with them as to the pieparation and submission of their claim, and that they succeeded through his advice, instructions and efforts in collecting the sum of 30,000 pesos, stipulated by the parties to have a value at the time of payment of $14,400.96. The award was made in November, 1922, and payment was received in the spring of 1923. The defendants deny that plaintiff advised with them in relation to the manner and method of collecting their expenses and state that his sole service in this connection was translating some letters, which he did without any promise of compensation. Again the defendants' contention does not seem to accord with the proof. It is not compatible with the relations heretofore existing between the parties. Bearing in mind the services rendered by the plaintiff in Mexico for which he received no compensation because the Fiontera contract was not consummated, considering his familiarity with all of the details of the Frontera project because of such services, and in view of his knowledge of the customs and procedure prevailing in the financial department of the Mexican government acquired through his former employment in its fiscal agency at New York, it appears most likely that plaintiff was assured of receiving a percentage of any recovery secured by the defendants. They had tried to collect from the Mexican government, and their claim had been rejected. It is a fact that the claim had been improperly prepared and the defendants were anxious to have a claim prepared and presented in accordance with the recognized custom of the Mexican fiscal department. The claim was so prepared and presented, as plaintiff states, under his supervision and a substantial sum collected. Defendants insist that no demand was ever made by plaintiff upon them for any part of this recovery and that his failure to make such demand indicates that he never believed that he was to receive any pay for services rendered in connection therewith. To this statement plaintiff replies that he was asked by Mr. E. F. Knauth, after the award was paid, not to withdraw his share of the money for a time because the firm needed the use of the funds and he acquiesced; but plaintiff shows that later he was allowed to overdraw his account with the firm to the extent of $1,000, and that he withdrew this money with the expectation that it would be charged against his credit from the Frontera account. I think that the proof bears out plaintiff's claim and he is, therefore, entitled to recover the sum of $2,160.44, being fifteen per cent of $14,400.96.

The 9th paragraph of the complaint was under continuous attack during the trial. Objection is aimed at the provision, " indemnity or compensation, or on account of the cancellation of

a certain contract between defendants and the Government of Mexico," because there was never any contract consummated. Of course there was never any contract, but defendants considered that they had a contract, and so testified many times during the course of the trial. This paragraph of the complaint was framed in the language and according to the understanding of the defendants in this respect, and, upon motion of the plaintiff, an amendment was allowed permitting the pleading to conform to the proof.

A verdict is directed in favor of the plaintiff and against the defendants for the sum of $732.33, with interest thereon from the 15th day of February, 1925, and for the sum of $2,160.44, with interest thereon from the 15th day of February, 1925.

Enter judgment accordingly.